IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| FARLAN L., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) 1:23CV570 |
| | ) |
| MARTIN J. O'MALLEY,[1] | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

MEMORANDUM OPINION AND ORDER
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Farlan L. ("Plaintiff") brought this action pursuant to Section 205(g) of the Social Security Act (the "Act"), as amended (42 U.S.C. § 405(g)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claim for Disability Insurance Benefits ("DIB") under Title II of the Act. The parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

I.  PROCEDURAL HISTORY

Plaintiff protectively filed an application for DIB on February 22, 2021, alleging a disability onset date of March 12, 2018. (Tr. at 27, 203-09.)[2] Plaintiff's application was denied

---

[1] On December 20, 2023, Martin J. O'Malley was sworn in as Commissioner of Social Security, replacing Acting Commissioner Kilolo Kijakazi. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Martin J. O'Malley should be substituted for Kilolo Kijakazi as Defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 405(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] Transcript citations refer to the Sealed Administrative Record [Doc. #5].

initially (Tr. at 84-90, 96-113) and upon reconsideration (Tr. at 91-95, 121-25). Thereafter, Plaintiff requested an administrative hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at 126-27.) On February 16, 2022, Plaintiff, along with his attorney, attended the subsequent telephonic hearing, at which Plaintiff and an impartial vocational expert testified. (Tr. at 27-28, 46-83.) Following the hearing, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act (Tr. at 41), and on May 9, 2023, the Appeals Counsel denied Plaintiff's request for review of that decision, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review (Tr. at 1-7).

II.  LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, the scope of review of such a decision is "extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1993) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is

evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[3]

---

[3] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program (SSDI), established by Title II of the Act as amended, 42 U.S.C. § 401 et seq., provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program (SSI), established by Title XVI of the Act as amended, 42 U.S.C. § 1381 et seq., provides benefits to indigent disabled persons. The statutory definitions and the regulations promulgated by the Secretary for determining disability, see 20 C.F.R. pt. 404 (SSDI); 20 C.F.R. pt. 416 (SSI), governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1.

Case 1:23-cv-00570-JEP   Document 12   Filed 09/30/24   Page 3 of 15

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then "the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on

---

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

4

that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that a significant number of jobs exist which the claimant could perform, despite the claimant's impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

III. DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" between his alleged onset date, March 12, 2018, and his date last insured, March 31, 2020. (Tr. at 30.) The ALJ therefore concluded that Plaintiff met his burden at step one of the sequential evaluation process. (Tr. at 30.) At step two, the ALJ further determined that Plaintiff suffered from the following severe impairments:

> osteoarthritis of the bilateral knees; degenerative disc disease; and hypertension[.]

(Tr. at 30.) The ALJ found at step three that none of these impairments, individually or in combination, met or equaled a disability listing. (Tr. at 31-33.) Therefore, the ALJ assessed Plaintiff's RFC and determined that, during the time period at issue, he could perform a range of medium work with the following, non-exertional limitations:

> [Plaintiff] could lift, carry, push, and pull 50 pounds occasionally and 25 pounds frequently; could perform[] frequent stooping, occasional balancing, as the term is defined in the Dictionary of Occupational Titles ("DOT"), and occasional climbing, kneeling, crouching, and crawling. He needed to avoid concentrated exposure to extreme cold and could have no more than occasional exposure to heavy machinery and unprotected heights.

(Tr. at 33.) At step four of the analysis, the ALJ found, based on the above RFC and the vocational expert's testimony, that Plaintiff remained capable of performing his past relevant work as a flagger. (Tr. at 39.) The ALJ further determined at step five that, given Plaintiff's age, education, work experience, RFC, and the testimony of the vocational expert as to these factors, he could perform other jobs available in significant numbers in the national economy. (Tr. at 40-41.) Therefore, the ALJ concluded that Plaintiff was not disabled under the Act. (Tr. at 41.)

Plaintiff now raises two challenges to the ALJ's RFC assessment. First, he contends that the ALJ both "relied upon inaccurate information regarding Plaintiff's work status and failed to evaluate [Plaintiff's] ability to afford treatment when assessing the supportability of his testimony and his ability to work." (Pl.'s Br. [Doc. #8] at 1, 4.) Second, Plaintiff argues that the ALJ "erred in her treatment of the medical opinion evidence." (Pl.'s Br. at 1, 14.) The Court agrees that Plaintiff's contentions merit remand, for the reasons set out below.

With respect to evaluation of a claimant's symptoms, the ALJ's decision must "contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." Social Security Ruling 16-3p, Titles II and XVI: Evaluation of Symptoms in Disability Claims, 2017 WL 5180304, at *10 (Oct. 25, 2017) ("SSR 16-3p"); see also 20 C.F.R. § 416.929. In Arakas v.

6

Commissioner of Social Security, 983 F.3d 83 (4th Cir. 2020), the Fourth Circuit clarified the procedure an ALJ must follow when assessing a claimant's statements:

> When evaluating a claimant's symptoms, ALJs must use the two-step framework set forth in 20 C.F.R. § 404.1529 and SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). First, the ALJ must determine whether objective medical evidence presents a "medically determinable impairment" that could reasonably be expected to produce the claimant's alleged symptoms. 20 C.F.R. § 404.1529(b); SSR 16-3p, 2016 WL 1119029, at *3.
>
> Second, after finding a medically determinable impairment, the ALJ must assess the intensity and persistence of the alleged symptoms to determine how they affect the claimant's ability to work and whether the claimant is disabled. See 20 C.F.R. § 404.1529(c); SSR 16-3p, 2016 WL 1119029, at *4. At this step, objective evidence is *not* required to find the claimant disabled. SSR 16-3p, 2016 WL 1119029, at *4–5. SSR 16-3p recognizes that "[s]ymptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques." Id. at *4. Thus, the ALJ must consider the entire case record and may "not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate" them. Id. at *5.

Arakas, 983 F.3d at 95. Thus, the second part of the test requires the ALJ to consider all available evidence, including Plaintiff's statements about his pain, in order to evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects [his] ability to work." Craig, 76 F.3d at 595. This approach facilitates the ALJ's ultimate goal, which is to accurately determine the extent to which Plaintiff's pain or other symptoms limit his ability to perform basic work activities. Relevant evidence for this inquiry includes Plaintiff's "medical history, medical signs, and laboratory findings," Craig, 76 F.3d at 595, as well as the following factors set out in 20 C.F.R. § 416.929(c)(3) and 20 C.F.R. § 404.1529(c)(3):

(i)     [Plaintiff's] daily activities;
(ii)    The location, duration, frequency, and intensity of [Plaintiff's] pain or other symptoms;
(iii)   Precipitating and aggravating factors;

7

> (iv) The type, dosage, effectiveness, and side effects of any medication [Plaintiff] take[s] or [has] taken to alleviate [his] pain or other symptoms;
> (v) Treatment, other than medication, [Plaintiff] receive[s] or [has] received for relief of [his] pain or other symptoms;
> (vi) Any measures [Plaintiff] use[s] or [has] used to relieve [his] pain or other symptoms (e.g., lying flat on [his] back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
> (vii) Other factors concerning [Plaintiff's] functional limitations and restrictions due to pain or other symptoms.

In the present case, the ALJ recounted these factors and acknowledged that "[d]iagnostic imaging dating from prior to [Plaintiff's] alleged onset date showed moderate to severe degenerative conditions in [Plaintiff's] bilateral knees" that could reasonably cause "some symptomology." (Tr. at 36.) However, the ALJ ultimately concluded that "the symptoms and limitations [Plaintiff] described in his testimony [were] significantly out of proportion to and inconsistent with both [sic] his subjective complaints to treating sources, the treatment sought, and findings on physical examinations by his own medical providers." (Tr. at 36.)

In making the later finding, the ALJ specifically cited Plaintiff's ability to work "for many years with his knee and back conditions with minimal, if any, medical treatment." (Tr. at 36.) The ALJ also found that, "[a]lthough [Plaintiff] did report significant symptoms to the consultative examiner in July 2019 and there were some abnormalities on that examination, as well as imaging, it is significant that on visits to his primary care providers shortly thereafter, he did not even mention his back or his knees." (Tr. at 37 (citing Tr. at 517-24).) Finally, as Plaintiff correctly notes, the ALJ stated that Plaintiff "was working construction in December of 2020 *five* times in her decision, reasoning that he was not as limited as alleged because of it" and further concluding that "the medical opinions in his file lacked persuasiveness because of

8

it." (Pl.'s Br. at 6.) Plaintiff now contends that the ALJ mischaracterized the above evidence, and thereby erred in her analysis of Plaintiff's subjective complaints. The Court agrees.

In particular, the assertion that Plaintiff continued to work in 2020 stems from a single treatment note from family nurse practitioner ("FNP") Zelda Fleming, who wrote in a treatment note dated December 8, 2020 that Plaintiff "continues to work and job is in construction." (Tr. at 413.) Because no other evidence reflects that Plaintiff worked in 2020, or at any time during the relevant period aside from an unsuccessful, one-day attempt in 2019, Plaintiff asserts that FNP Fleming's statement was "very likely . . . a typo, instead meaning to indicate [Plaintiff's] trade when he was working." (Pl.'s Br. at 6.) Defendant refuses to concede this point, countering that Plaintiff's "speculation does not explain why . . . [the] statement [in question] was made in the present tense." (Def.'s Br. [Doc. #11] at 10.) However, Plaintiff's own reports were consistent that he stopped working as a plumber in 2017 because of his knees, due to the lifting and walking demands, and then performed odd jobs for a temporary agency until March 2018, which ended after various employers told the temporary agency they could not use Plaintiff due to his physical limitations, and that he tried to work in 2019 but only worked one day, earning only $50. (Tr. at 70, 57-58, 362, 222, 447.) This account is set out consistently in his testimony, where he denied any work in 2020 and specifically denied any construction work or any other type of work in December 2020, as well as his work history report, his report to the consultative examiner in July 2019, and his reports to other physicians. (Tr. at 70, 57-58, 362, 222, 447.) Notably, at step 2 of the sequential evaluation process, the ALJ stated that:

> There are indications within the medical record of the claimant performing other, unreported, work activities as recently as December 2020. Because the

9

> claimant denied having done any other work, <u>it is not possible to resolve this issue</u>. However, as a decision can be reached at a later step of the sequential evaluation process, <u>it is not necessary to develop this issue further</u>.

(Tr. at 30 (emphasis added) (citing Tr. at 413).) Given that the ALJ did not resolve this issue, or make a determination that Plaintiff's denial was not credible, it is not clear how or why the ALJ could then rely on that treatment note, contrary to Plaintiff's testimony, to find that he was performing construction work in December 2020 as part of the analysis in setting the RFC. Moreover, given that the Social Security Administration's own earnings records reflect no work in 2020 (Tr. at 211-12, 271), Defendant's position finds no support in the record.[5]

Defendant further argues that "the December 2020 treatment note was only one piece of evidence that the ALJ considered, and the ALJ did not find that Plaintiff was ineligible for DIB because he was working or that Plaintiff was capable of returning to heavy exertion construction work." (Def.'s Br. at 10.) This argument skirts the issue at hand, i.e., whether the ALJ properly considered Plaintiff's subjective complaints when formulating his RFC assessment. Here, the ALJ clearly considered Plaintiff's purported ongoing ability to work—mentioning it five times in her decision—when making this finding. (Tr. at 35-38.) Although it was not the only factor considered by the ALJ, the ALJ herself described Plaintiff's ongoing work as "significant" in terms of gauging Plaintiff's condition and limitations. (See, e.g., Tr. at 37) ("The record, including [Plaintiff's] treatment records, reflects a significant worsening of [his] orthopedic conditions in late 2020, well after his date last insured, and the absence of reports of significant symptoms on medical examination earlier that same year, <u>along with a</u>

---

[5] The records specifically support Plaintiff's testimony that he attempted work for one day in 2019 and earned only $50, with no other work in 2019, and no work in 2020. (Tr. at 212, 271.)

10

reference to work activity, supports a finding that the worsening had not yet occurred as of the date last insured.") (emphasis added); (Tr. at 37-38) ("Notably, on later visits to his primary care provider through the date last insured and for several months beyond, [Plaintiff] did not even mention his knees as a problem area. Further, and even more significantly, when he did next mention his knees being a concern to his primary care provider in December of 2020, it was noted that he was still working construction.") (emphasis added); (Tr. at 38) ("Given the reports of knee pain and the reference to working construction in December 2020, it is reasonable to infer that [Plaintiff's January 2022 appointment with orthopedist G. Scott Dean, M.D.] coincides approximately with a worsening of [Plaintiff's] condition.") (emphasis added). Thus, the ALJ's substantial reliance on what appears to be a misstatement or typographical error in a single medical record undermines the analysis and reasoning supporting the ALJ's ultimate determination. Given the substantial weight given to this contested and unresolved factual dispute, the Court cannot follow the ALJ's reasoning, and the determination is not supported by substantial evidence.

Defendant also points to the ALJ's conclusion that "[a]lthough [Plaintiff] did report significant symptoms to the consultative examiner in July 2019 and there were some abnormalities on that examination, as well as imaging, it is significant that on visits to his primary care providers shortly thereafter, he did not even mention his back or his knees." (Tr. at 37 (emphasis added) (citing Tr. at 516-524).) Notably, this summary significantly minimizes the actual consultative examination and imaging in July 2019. On review by Dr. Richard Reid, Plaintiff's July 2019 knee x-rays reflected "moderate to laterally severe degenerative changes with more prominent involvement of the medical compartment and patellofemoral joint" in

11

this right knee and "[p]rominent ossified intra-articular loose bodies in the suprapatellar bursa and popliteal space" with "[m]oderate to severe degenerative changes with more prominent involvement of medial compartment and patellofemoral joint" in his left knee. (Tr. at 367-68.) On examination, the consultative examiner, Dr. Mitchell Bloom, noted severe bowing of his knees bilaterally, "severe crepitus in both of his knees" and a diagnosis of "[s]evere osteoarthritis in bilateral knees" with a functional assessment limiting him to standing and walking no more than four hours based on his "[s]evere osteoarthritis with severe crepitus and decreased range of motion and severe genu varus bilaterally" and limited him to lifting only 20 pounds occasionally and 10 pounds frequently based on "[i]ncreased pain in knees with heavy lifting." (Tr. at 361-65.)

Further, the primary care visits cited by the ALJ focused on Plaintiff's "uncontrolled and poorly treated hypertension." (Tr. at 36-37.) The first of these visits occurred on September 30, 2019, when Plaintiff visited Cone Health Community Health and Wellness Center for the first time. (Tr. at 518.) At that time, Plaintiff stated that his appointment was "to establish care for hypertension." (Tr. at 517-18.) As Plaintiff lacked health insurance, he received his previous care for elevated blood pressure on an emergent basis, including visits to the emergency department in May and July of 2019. (Tr. at 388, 507.) On these occasions, Plaintiff had run out of blood pressure medication and experienced headache, weakness, dizziness, and lightheadedness as a result. (Tr. at 385, 507.) From September 2019 forward, FNP Fleming served as Plaintiff's primary care provider, and at his first appointment, Plaintiff was "advised to apply for financial assistance and schedule to see [Cone Health's] financial counselor." (Tr. at 518; see also Tr. at 68.) Accordingly, the record demonstrates that Plaintiff

12

initially established primary care to deal with his hypertension, which had recently prompted at least two emergency room visits and could prove life-threatening. (See Tr. at 399, 517, 522.) This does not necessarily mean that Plaintiff's failure to seek treatment for his back and knees at his visits for hypertension reflects that these conditions were not severe or impactful on Plaintiff.[6] Moreover, it is not clear how the ALJ would analyze this issue in the absence of the reliance on purported construction work in 2020, discussed above, since each reference to the treatment record also includes reliance on the reference to work activity in 2020, which the ALJ found was "even more significant[]." (Tr. at 37, 38.)

As a final matter, the Court recognizes that the sparse medical record pertaining to Plaintiff's knees during the relevant time period complicates the disability determination in this case. However, the ALJ acknowledged that, at some point between Plaintiff's alleged onset date in 2018 and his hearing in 2022, Plaintiff's knee condition worsened to the point that it necessitated surgery and precluded the RFC as written. (See Tr. at 37, 38.) As noted above, the consultative examination provides the results of imaging and examination with respect to the status in July 2019 prior to the date last insured, which appears to be the only

---

[6] Notably, it appears that Plaintiff's initial assistance may have covered treatment at the Community Health center itself, but not outside providers, since, upon Plaintiff's first treatment for knee pain with FNP Fleming in December 2020, she again noted that Plaintiff needed an application for financial assistance. (Tr. at 415.) Thereafter, FNP Fleming was able to refer Plaintiff for orthopedic care, which continued from that point forward. (Tr. at 68; see also Tr. at 445-47, 482-84.) To the extent the ALJ relied on Plaintiff's lack of specialized medical care, Plaintiff argues that, in assessing both Plaintiff's subjective statements and his overall RFC, the ALJ failed to properly consider the reasons for Plaintiff's minimal medical treatment, since a claimant may not be penalized for failing to seek treatment he cannot afford. Plaintiff testified that he lost his medical insurance when the increasing severity of his knee impairment forced him to stop working in March of 2018. (Tr. at 65.) The ALJ asked Plaintiff if he tried to see a free clinic after that time. (Tr. at 66.) Plaintiff responded that he did not, and that his only treatment was in the emergency department until he established care in 2020. (Tr. at 65-68.) Notably, the ALJ made no findings on this issue. Because it is the role of the ALJ, not the Courts, to resolve ambiguities in the record, the Court finds to the extent the ALJ relies on the lack of medical treatment, it is up to the ALJ to address the reasons for Plaintiff's minimal medical treatment in the first instance.

13

imaging and examination of Plaintiff's knees during the relevant time period. (Tr. at 364-65, 367-68).[7] While it remains the Plaintiff's burden to provide evidence of disability, the ALJ must fully and fairly consider the evidence Plaintiff presents. Here, it appears that the ALJ mischaracterized evidence pertaining to Plaintiff's work activity and relied on a statement regarding Plaintiff's purported work in December 2020, which was likely a typographical error and was directly contested by Plaintiff, without resolving the dispute. She then based her analysis of Plaintiff's statements and the RFC assessment on this disputed and apparently erroneous statement, and discounted the imaging and evidence from the only physician actually conducting examination of Plaintiff's knees, thereby rendering her decision unsupported by substantial evidence.[8]

IT IS THEREFORE ORDERED that the Commissioner's decision finding of no disability is REVERSED, and that the matter is REMANDED to the Commissioner under sentence four of 42 U.S.C. § 405(g). To this extent, it is further ORDERED that First

---

[7] As the ALJ acknowledges, Plaintiff's later orthopedist records reflect that by January 2022, Plaintiff's arthritis in his knees was "end stage" and he was scheduled for surgery, and those notes include readings of Plaintiff's earlier x-rays, with moderately severe arthritis by 2012 and 2014, continuing to worsen over time. (Tr. at 482.)

[8] Plaintiff also alleges error based on the ALJ's evaluation of the opinion evidence, particularly the ALJ's decision to discount the evidence from the consultative examination by Dr. Bloom, which reflects the only actual examination and evaluation of Plaintiff's knee impairment during the relevant period. In addition, Plaintiff notes that the ALJ failed to address at all the opinion evidence of the state agency physician at the initial level, Dr. Virgili, who found that there was insufficient evidence regarding the period prior to the date last insured, but also found that the records and opinion of Dr. Bloom at the consultative examination were persuasive and that a limitation to light work was appropriate. (Tr. at 87-88.) Defendant contends that the ALJ was "not the state agency's opinion after Plaintiff sought reconsideration of that determination." (Def. Br. at 12.) Defendant contends that the ALJ instead could rely on the subsequent reconsideration evaluation "[i]n July 2021, [by] Dr. Ellen Huffman-Zechman, a second state agency physician." (Def. Br. at 12.) However, the evaluation by Dr. Huffman-Zechman was made in July 2019 with respect to a prior application by Plaintiff, and did not post-date or reconsider the evaluation by Dr. Virgli. These issues can be considered further on remand in evaluating the available evidence.

Defendant's Dispositive Brief [Doc. #11] is DENIED, and Plaintiff's Dispositive Brief [Doc. 8] is GRANTED to the extent set forth herein.

This, the 30th day of September, 2024.

/s/ Joi Elizabeth Peake
Joi Elizabeth Peake
United States Magistrate Judge